## Chouteaux *versus* Leech & Co.

1. Where goods are received by persons as carriers, and receipt and bill of lading delivered, it was not error in the Court to refuse to receive parol evidence that the defendants were not common carriers for the whole distance stated in the bill of lading: The question of liability of defendants depended *on the contract*.

2. A contract with an agent about the business to which the agency relates, is a contract with the principal, and the validity of the contract is not affected by a limitation of the agent's authority of which the other contracting party had not notice: and where the agent had authority to do the act, the principal cannot avoid responsibility by showing that he did not intend to assume it.

3. That a clause in the bill of lading, limiting the responsibility of the carrier, was inserted or left in the printed bill of lading *by mistake*, may be proved by circumstantial as well as positive evidence: The question as to mistake was for the jury; the burden of proof as to it was on the plaintiffs who alleged it.

4. Slight evidence should be sufficient to set aside a provision in a bill of lading which is designed to relieve the carrier from the ordinary legal responsibility. Perhaps all such provisions should be treated as void unless expressly assented to by the employer. Per BLACK, C. J.

5. When goods in the care of a carrier become injured, it is his duty to make ordinary and reasonable exertion to repair the injury or lessen its effect: Therefore, where packages of furs become wet, it is the duty of the carrier to have them opened and dried.

THIS was an action by Pierre Chouteaux *et al. v.* David Leech *et al.*, trading as ·D. Leech & Co.

[Chouteaux *v.* Leech & Co.]

This case came up from the *Nisi Prius.* It was an action for damages to certain packages of furs, shipped at Cincinnati, to be carried to New York. The furs were carried from Cincinnati to Pittsburgh in the steamboat Defiance, which ran upon a snag, and the furs became wet and were injured. The defendants admitted that they were carriers upon the canals and railroads of Pennsylvania, between Pittsburgh and Philadelphia, but they denied that they were carriers on the Ohio river; they alleged that in order to secure freights, they had agents at Cincinnati, and other points on the Ohio river, whose duty it was to receive goods at those points and ship them by the boats running on the Ohio, to D. Leech & Co., at Pittsburgh, who thence carry them in their own boats and cars to Philadelphia. They were not the owners of the steamer Defiance. The goods in question were forwarded from St. Louis to Cincinnati, in that steamer, to J. Foster & Co., at Cincinnati, who there placed them under the care of defendants' agents, Irwin & Foster, who signed the following bill of lading:

" D. Leech & Co.'s Lines for Philadelphia, Baltimore, and New York.

Warehouses in Philadelphia, No., &c. Warehouse in Pittsburgh, &c. Warehouse in Baltimore, &c. Warehouse in New York, No. 7 West street.

Pittsburgh, Cincinnati, June 26, 1845.

Received of John T. Foster & Co., the following packages in apparent good order, marked as per margin, which we promise to deliver in like order (the dangers of the railroads, canal and river navigation, fire, leakage of merchandise, and unavoidable delays excepted, of which the certificate of a collector or lock-keeper, or the affidavit of a boat captain, or car master, shall be evidence), to P. Chouteaux, jr. & Co., in New York, on presentation of this receipt and payment of freight, at the rate of one 37-100 dollars per 100.

Freights delivered in Philadelphia and Baltimore at the warehouses of the line, in other cities on the wharf. The responsibility of the line to commence upon the shipment of the goods from Pittsburgh. Freights to be paid on original weights, without deduction for leakage.

| MARKS. | | |
|---|---|---|
| P. C. | Twenty-four packs furs, - - - | 3737 |
| | pr. D. Leech & Co. | |
| | IRWIN & FOSTER." | |

In the bill of lading, *Pittsburgh* was stricken out and *Cincinnati* inserted.

The furs were landed on the wharf at Cincinnati, and were by Irwin & Foster, defendants' agents, immediately returned on board the Defiance, to be continued up to Pittsburgh, and there delivered

[Chouteaux *v.* Leech & Co.]

to D. Leech & Co. The boat left Cincinnati on June 28, 1845, and at about 3 o'clock of the morning of the 30th June, just before daylight, in putting out from Galliopolis, it ran on a snag, sprung a leak, and the furs were wet. On the 4th of July they were delivered to defendants, at their warehouse *at Pittsburgh*, unaccompanied by any notice that the packages had been in the water. They were packed with the skin outside, and the fur was thus concealed. The skin being greasy did not show the effect of the water, and D. Leech & Co. had not their attention in any way called to the necessity of opening, examining, or drying them. On July 5th the goods were shipped by one of defendants' *canal-boats*, when the following bill of lading was given by defendants.

" Western Transportation Company, D. Leech & Co.'s Lines for Philadelphia, Baltimore, and New York.

Pittsburgh, July 7th, 1845.

Received of Irwin & Foster the following packages, in apparent good order, marked as per margin, which we promise to deliver in like good order (the dangers of the railroads and canal navigation, fire, leakage of merchandise, and unavoidable delays excepted, of which the certificate of a supervisor, collector, or lock-keeper, or the affidavit of a boat captain, or car master, shall be evidence), to P. Chouteaux, jr. & Co., New York, within — days (Sundays excepted). (Here follow marks, &c., of goods.)

D. Leech & Co.
Per Oliver Peppard."

July 23, the furs were delivered in a damaged state to the plaintiffs, at New York.

The declaration, in the first count, alleged that the defendants were common carriers from Cincinnati to New York. That John F. Foster & Co., on the 26th of June, 1845, at Cincinnati, caused to be delivered to the defendants, and the defendants accepted certain packages, &c., to be safely and securely carried by defendants from Cincinnati to New York, and there safely delivered to plaintiffs for a certain reward. Yet the defendants not regarding their duty, but contriving, &c., did not safely carry the same and safely deliver to the plaintiffs ; but, on the contrary, so carelessly and negligently behaved, &c., that by their carelessness, &c., the said packages were injured, &c.

The second count set forth, that the defendants were carriers from Pittsburgh to New York; that certain Irwin & Foster, on July 27, at Pittsburgh, caused to be delivered to defendants, and defendants received whilst they were common carriers, &c., certain packages, &c., to be by defendants safely carried from Pittsburgh to New York, and there safely delivered to plaintiffs, &c., as in first count.

The third count alleged that on 27th June, 1845, John F. Foster & Co., at special instance, &c., of defendants, at Philadelphia

[Chouteaux *v.* Leech & Co.]

aforesaid, delivered to defendants divers goods, &c., to be carried to New York, to be delivered to plaintiffs, for a certain freight (the dangers of railroads, and canal and river navigation, fire, leakage of merchandise, and unavoidable delay, excepted), and defendants then and there received the same, and it became their duty to take good care of same; yet not regarding their duty, &c., took so little care of said goods and the carriage thereof, that the same, by reason of said improper care, and not by reason of said excepted causes, were greatly injured, &c.

On the trial, Wm. F. Leech was examined on the part of defendants, and testified:—Furs when sent for carriage are placed in packs, the fur side in, and bound round with cords. They are not put in canvas or cloth of any kind. The inner side of the hide or skin is packed outside, which, in warm weather, is always greasy, and would not retain the water; Leech & Co., at Pittsburgh, could not tell from the outside of the packs that they had been in water; could only have found it out by opening the packs; D. Leech & Co. were not owners of or interested in the steamer Defiance.

Question by defendant's counsel: Were D. Leech & Co. at any time common carriers on the Ohio river from Cincinnati to Pittsburgh? Question objected to by plaintiffs, and overruled by the judge. Defendants excepted.

Question: Between what points were D. Leech & Co. carriers? Also objected to, overruled by Court, and exception by defendants.

Question: What were the powers of Irwin & Foster, as agents of defendants, and what was the extent of their agency? Objected to by plaintiffs, overruled by the Court, and exception by defendants.

On the part of *the defendants* it was contended, on the trial, that the defendants were not carriers *on the Ohio river*, but were merely such on the state works between Pittsburgh and Philadelphia. That they had an agent at Cincinnati, whose duty was to receive goods at that place, and forward them to Pittsburgh, to defendants, to be by them carried to Philadelphia, and forwarded (in this case) to New York. That these goods were in fact carried up the Ohio by the owners of the steamer Defiance, who were, so far, responsible as the carriers.

That, therefore, for an injury done on the river, the defendants were not responsible *as common carriers*, but only as agents for the plaintiffs for the shipping of the goods to Pittsburgh, as to which they were bound to use ordinary care in the protection of the goods while in their agent's hands at Cincinnati, and the selection of a proper boat to take them to Pittsburgh. No damage occurred at Cincinnati, and the boat selected was the one the plaintiff's consignors had chosen to bring the furs to that point. That damages could not be recovered against the defendants as

[Chouteaux *v.* Leech & Co.]

such agents, for want of proper care in the shipment to Pittsburgh, inasmuch as no count averred such a case.   That there was no evidence of such want of care, and the burthen of proof was on the plaintiff.

Again: That if the defendants were to be considered as common carriers on the Ohio river, the stipulation in the Cincinnati bill of lading, *that defendants' responsibility should not commence until the shipping of the plaintiffs' goods at Pittsburgh*, discharged the defendants from all responsibility for the carriage of the goods to that place.

And again: That the damage to the goods having been caused upon the river, by one of the dangers of the river navigation excepted in the bill of lading, the defendants were not liable.

The case was tried before ROGERS, J., who, *inter alia*, charged the jury as follows:—

"The defendants contend that they are not liable, because it appears on the bill of lading, that the responsibility is to commence only upon the shipment of the goods from Pittsburgh.   If that be so, there is an end to the plaintiff's case, because the injury having been done to the goods between Cincinnati and Pittsburgh, there was no responsibility resting on the defendants, except to select a competent person to carry the goods to Pittsburgh; and, consequently, they were not liable.

"Is it not more reasonable, as plaintiff says, to suppose (as I submit this question to you), that this has arisen from an omission to strike out of the bill of lading the words 'the responsibility of the line to commence upon the shipment of the goods from Pittsburgh?'   You will ask whether the bill of lading was not intended for the meridian of Pittsburgh?   'Pittsburgh' is stricken out, and 'Cincinnati' inserted; and they have neglected, not intentionally, I am convinced, to strike out the words ruled in the printed form.   On this part of the case the burden of proof is on the plaintiffs.   They must satisfy you of the mistake in the bill of lading.   In that case the defendants would be agents for transmission merely, and, of course, not liable for the misconduct of the captain of the steamboat.   If these words do not form part of the contract, the defendants are common carriers, and are liable as such.

"This part of the case is submitted to you.   If you believe the parties intended to limit the responsibility of Leech & Co., so that they should not be answerable until the goods reached Pittsburgh, your verdict will be in favor of the defendants.   But if you should be of a different opinion, then you have another point to consider.

"Did the defendants, or their agents, exercise ordinary care and diligence in preserving the goods committed to their charge?   This is a question for you.   I instruct you that when goods and mer-

[Chouteaux *v.* Leech & Co.]

chandise (as here), received by a common carrier, to be delivered in good condition, 'the dangers of the river excepted,' get wet in consequence of accident, and no exertion is made by the carrier to dry them, and they are damaged, in such a case the carrier is liable. He is bound to use at least some exertion to prevent the effects of the injury, as long as it will probably avail anything. And for this purpose he would be right to open the packages in which the furs were contained.

"It cannot be the law that when a shipper's property, in the custody of a common carrier, is injured by inevitable accident, that the carrier is at liberty to abandon it altogether. It is the duty of the carrier to use ordinary exertions to lessen, if not altogether prevent the effects of the accident. Common sense would lead us to the conclusion that he should use at least the same care and diligence as if the goods were his own.

"This is a question of fact for you. Did the defendants or their agents use proper skill and diligence in respect to the goods after the accident? If they did, your verdict will be in favor of the defendants, because, as was before observed, the accident occurred from the boat running against a snag, which is one of the perils in the navigation of the Ohio. The jury will then observe that they have two points to determine:—

"1. Was it the intention of the parties in the contract at Cincinnati, that the responsibility of the defendants should not commence until the goods were shipped at Pittsburgh? If so, as I have before remarked, there is an end of this case, and your verdict must be in favor of the defendants.

"2. Was due diligence used and proper care taken of the goods after the 30th of June, 1845, when the accident occurred, by the defendants or their agents? If you are of opinion that proper diligence was used and due care taken of the goods after the accident, your verdict will be in favor of the defendants. In considering this case, you must recollect that the acts and omissions of the agents are the acts and omissions of the principals.

"But if you should believe that the responsibility of defendants, as common carriers, commenced at Cincinnati, and that proper care was not taken to preserve the goods from damage after the accident, then your verdict will be in favor of the plaintiffs.

"In that case you will have to assess the damages, about which you can have no difficulty. The measure of damages will be the injury that the goods have sustained; the difference between a sound and unsound or deteriorated article; deducting therefrom the freight from Cincinnati to New York. You may also add interest on the balance from the time of the arrival of the furs at New York, until your verdict is rendered."

Verdict was rendered for the plaintiffs.

U

[Chouteaux *v.* Leech & Co.]

On the part of Leech &°Co. it was assigned for error : 1. That the judge charged that the captain of the steamer Defiance was the agent of the defendants, and that they were liable for his acts and omissions as common carriers. 2. In directing the jury to find whether the clause in the Cincinnati bill of lading, "The responsibility of the line to commence upon the shipment of the goods from Pittsburgh," was inserted by mistake, when there was no evidence of such mistake. 3. In directing the jury to find what was the contract as set out on the bill of lading, and to construe it. 4. In charging that the defendants, as common carriers, were bound to open the bales of furs and dry and repack them. 5. In refusing to permit W. F. Leech to answer the question, viz. "Were D. Leech & Co. at any time common carriers on the Ohio river from Cincinnati to Pittsburgh." 6. In overruling defendants' question 'put to W. F. Leech, viz. "Between what points were D. Leech & Co. carriers." 7. In overruling defendants' question, viz. "What were the powers of Irwin & Foster as agents for defendants, and what was the extent of their agency."

*McMurtrie* and *McIlvaine* were for Leech & Co.—It was contended that the judge erred in charging that the captain, &c., of the steamer Defiance, were agents of the defendants, and that defendants were responsible for their acts, &c., as common carriers. The Defiance was not owned or controlled by defendants. The defendants carried only from Pittsburgh, and this was known. Their agent at Cincinnati was employed to secure contracts for carriage of goods from Pittsburgh eastward, for the accommodation of owners of goods, and to secure freight; he, in addition, agreed to receive the goods at Cincinnati, and use proper care in shipping them to defendants at Pittsburgh. When he had done this, the defendants' duty and responsibility were at an end, and the owner must look to the actual carriers, the steamer's owners, for damages done on board of it.

Defendants, on shipping the goods on the Defiance, took a bill of lading from her captain for delivery of the goods at Pittsburgh, on which suit should have been brought.

Defendants were plaintiffs' agents to ship to Pittsburgh. They had a *contract* with the owners of the steamer, that the latter should carry safely, which was for plaintiffs' benefit, and is different from employing the steamer as agent.

That the clause in bill of lading from Cincinnati, "The responsibility of the line not to commence until the shipment of the goods at Pittsburgh," was conclusive upon this subject. That it showed that the defendants were not expected to carry up to that point, by themselves or their agents, because in either case the clause would have been absurd. That the other party knew that defendants neither carried themselves, nor were accustomed to

carry by others. Defendants got no reward for carrying on the Ohio. The steamer was the carrier, received the freight, and was responsible.

*W. B. Reed* and *H. M. Phillips*, were for Chouteaux and others.—The plaintiffs in the suit were the owners and consignees of the packages of furs, which were delivered to the agents of the defendants at Cincinnati, for transportation and delivery to the plaintiffs at New York. The goods were put on board of the steamer Defiance, the packages got wet, and nothing was done towards drying them. They were injured, and the amount of their injury was agreed upon and a verdict rendered for the plaintiffs. It was contended that the defendants were common carriers, and the clause in the bill of lading could apply to no other *river* than the Ohio.

As to the 5th, 6th, and 7th assignments, the question as to whether the defendants were common carriers did not depend on the opinion of the witness, but on the construction of the contract.

As to the 2d and 3d assignments, there was evidence on which the jury could find that the retention of the word "Pittsburgh," in the bill of lading, was *by mistake.*

As common carriers, the defendants were bound to have had the bales opened and dried, and repacked: 1 *Missouri* 81, Bird *v.* Cromwell; 3 *Id.* 264; 5 *Id.* 36; 6 *Id.* 372; 2 *Bailey's Rep.* 157; 4 *Harrington* 448, McHenry *v.* Railroad; *Angell on Carriers* 282; 5 *Bing.* 217; 8 *Barr* 479; 3 *Story* 349. In general, in a count for negligence in a carrier, the particulars in which the negligence consisted need not be stated: 1 *Sandford* 89.

The opinion of the Court was delivered, April 12, 1852, by

BLACK, C. J.—The evidence which the Court in the 5th and 6th assignments of error is complained of for rejecting, was intended to prove that the defendants were not common carriers west of Pittsburgh; in other words, that they were not accustomed to carry goods for hire for all who chose to employ them on the Ohio river. But the evidence was properly rejected, because the right of the plaintiff to recover, &c., depended on the obligation created by the particular contract on which the suit was founded. If they bound themselves on this occasion to the duty of common carriers, it is no defence to say that they had never done so before, or that it was not their direct or principal business: 1 *W. & Ser.* 285; 7 *Yeager* 340; 4 *N. H.* 304.

In the 7th specification, it is said the judge erred because he refused to permit the defendants to ask the question, "What were the powers of Irwin & Foster, and what was the extent of their agency?" When an agent is appointed, a contract made with him about the business to which the agency relates is a contract

[Chouteaux *v.* Leech & Co.]

with the principal, and the validity of the contract is not affected by a limitation of the agent's authority, of which the other contracting party had no notice. This would have been enough to make the exclusion of the proposed evidence perfectly proper. But there was another reason. The defendants did not assert in the *Nisi Prius*, nor was it any part of their argument here, that the agents had not authority to do what they did. Now if the acts done by them exposed their principals to the risks of common carriers on the Ohio, the principals cannot, of course, clear themselves from responsibility by showing that though they authorized the act, they did not intend that its legal effects should follow.

The greatest pressure of the defendants' argument was on the exception to that part of the charge which submits to the jury the question whether the words, "The responsibility of the line to commence upon the shipment of the goods from Pittsburgh," were or were not inserted in, or rather left unerased from, the bill of lading by mistake. It is contended that there was no evidence of such mistake. But we think otherwise, for reasons which may be stated very briefly. A mistake like the one alleged here can be proved as any other fact is proved, by circumstantial as well as by positive evidence. There are several facts from which it may be inferred. The printed bill of lading was manifestly intended to be used at Pittsburgh. In order to make it answer for Cincinnati, it was obviously proper to strike out Pittsburgh wherever the word occurred, and insert Cincinnati. It was so altered in the date, and the omission to do so at the other place certainly looks more like an accident than anything else. It is not certain, but it is probable, that the object of having the contested clause in a Pittsburgh bill was to prevent the responsibility of the defendants from commencing when the goods were received at their warehouse, instead of attaching only from the time of their actual shipment. The dangers of the river navigation are excepted, and this by plain construction makes them liable for the other dangers which are not excepted. They received the full freight from Cincinnati to New York, and this is wholly inconsistent with the notion that they were mere agents for the shipment of the furs, and not carriers from Cincinnati to Pittsburgh, as well as on all other parts of the route. Other facts might be mentioned, but these are enough to show that there was some evidence of mistake, and the judge was right in submitting it to the jury.

It is of the utmost importance to the commerce of the country that carriers should be held to strict accountability. Gross wrongs would be practised every day if the laws on this subject were relaxed. Slight evidence ought to be sufficient to set aside any special provision in the bill of lading, which is intended to relieve the carrier from his ordinary legal responsibility. And this not only because public policy requires that carriers should have the

[Chouteaux v. Leech & Co.]

strongest interest in the performance of their duties, but also on account of the manner in which such stipulations are generally made. Goods are commonly sent by the owner to the carrier's place of business, where they are received, and the bill of lading made out by the carrier or his clerk. It is often not seen by the owner until it is too late to insist on a change in the terms. It can hardly be called a contract, for a contract requires the assent of both parties. The better rule perhaps would be, to treat all provisions of this kind as void, unless inserted by the express consent of the employer.

The charge that the defendants were bound to have the furs unpacked and dried, is said to be erroneous, but that is not our opinion. The decision of the judge on this point is well supported by clear and unanswerable reasoning; is sustained by a case directly analogous (Bird v. Cromwell, 1 *Missouri* 58), and is opposed by no authority which we have been able to find.

Judgment affirmed.